**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JIM BASS HOLDEN,

      Petitioner

v.

ISIDRO BACA, et al.,

      Respondents

Case No.: 2:14-cv-00894-APG-BNW

**ORDER DENYING THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Jim Bass Holden's third-amended 28 U.S.C. § 2254 petition is before me for final disposition on the merits. ECF No. 39.  As discussed below, Holden's petition is denied.

I.      **Brief Procedural History and Background**

In May 2006, a jury convicted Holden of count 1: burglary while in possession of a firearm; count 2: conspiracy to commit murder; count 3: extortionate collection of debt; and count 4: first-degree murder with use of a deadly weapon (exhibit 13).[1]  The trial judge sentenced Holden as follows: count 1 – 24 to 120 months; count 2 – 24 to 120 months, concurrent with count 1; count 3 – 21 to 48 months, concurrent with counts 1 and 2; count 4 – life without the possibility of parole plus an equal and consecutive term of life without the possibility of parole for use of the deadly weapon, concurrent with counts 1, 2, and 3 and consecutive to case nos. C202943 and C214716. Exh. 1.  Judgment of conviction was entered on June 15, 2006. *Id.*

The Supreme Court of Nevada affirmed the convictions. Exh. 17.  After an evidentiary hearing the state district court denied Holden's state postconviction habeas corpus petition.

---

[1] Exhibits referenced in this order are found at ECF Nos. 16, 25, 37, 40-43, 45.

Exhs. 75-78.  The Supreme Court of Nevada affirmed the denial. Exh. 23.  Holden filed second and third state postconviction petitions, which were also denied. Nevada Supreme Court Case Nos. 65331, 67970.

II.   **Legal Standards**

a.   **AEDPA Standard of Review**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for my consideration of the petition in this case:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002).  My ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to

2

1  meet and highly deferential standard for evaluating state-court rulings, which demands that state-

2  court decisions be given the benefit of the doubt") (internal quotation marks and citations

3  omitted).

4      A state court decision is contrary to clearly established Supreme Court precedent, within

5  the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing

6  law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

7  materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a

8  result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting

9  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) and citing *Bell*, 535 U.S. at 694).

10     A state court decision is an unreasonable application of clearly established Supreme

11 Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the

12 correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies

13 that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529

14 U.S. at 413).  The "unreasonable application" clause requires the state court decision to be more

15 than incorrect or erroneous; the state court's application of clearly established law must be

16 objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

17     To the extent that the state court's factual findings are challenged, the "unreasonable

18 determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v.

19 Blodgett*, 393 F.3d 943, 972 (9th Cir.2004).  This clause requires that the federal courts "must be

20 particularly deferential" to state court factual determinations. *Id*.  The governing standard is not

21 satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at

22 973.  Rather, AEDPA requires substantially more deference:

23         [I]n concluding that a state-court finding is unsupported by substantial evidence in
           the state-court record, it is not enough that we would reverse in similar

3

circumstances if this were an appeal from a district court decision.  Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### b.  Ineffective Assistance of Counsel

Ineffective assistance of counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness.  To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

1   Ineffective assistance of counsel under *Strickland* requires a showing of deficient

2   performance of counsel resulting in prejudice, "with performance being measured against an

3   objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v.*

4   *Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the

5   ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland*

6   prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that,

7   but for counsel's errors, he would not have pleaded guilty and would have insisted on going to

8   trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

9   If the state court has already rejected an ineffective assistance claim, a federal habeas

10  court may only grant relief if that decision was contrary to, or an unreasonable application of, the

11  *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong

12  presumption that counsel's conduct falls within the wide range of reasonable professional

13  assistance. *Id.*

14  The Supreme Court of the United States has described federal review of a state supreme

15  court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*,

16  563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme

17  Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . .

18  through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted). Moreover,

19  federal habeas review of an ineffective assistance of counsel claim is limited to the record before

20  the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The Supreme

21  Court has specifically reaffirmed the extensive deference owed to a state court's decision

22  regarding claims of ineffective assistance of counsel:

23       Establishing that a state court's application of *Strickland* was unreasonable
         under § 2254(d) is all the more difficult. The standards created by *Strickland* and

5

§ 2254(d) are both "highly deferential," *id.* at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

## III.   **Trial Testimony**

At Holden's trial, Vanessa Pena testified for the State. Exh. 60, pp. 56-132. She was staying at her friend Gerardo Ojeda-Garcia's apartment on the night March 24, 2004. She was sleeping on a mattress in the living room when she woke up to Garcia arguing with one white man and two Hispanic men. She described the white man as bald with an orangish, brownish goatee and said he was carrying a rifle. She knew one of the Hispanic men as Smokey. The exchanges were in Spanish. Pena stated that Garcia had sent his friend out to try to get money that Garcia owed Smokey. The white man subsequently asked in English what time it was. Smokey told him it was 9:15, and the man stated that if the friend did not return by 9:25 then the man was going to "pop [Garcia] in the leg." Smokey repeated this to Garcia in Spanish. Garcia told Smokey to take a television that was in the back room. Smokey and the other Hispanic man went back and returned with the TV. Smokey told the white man in English "I'm going to go

1   start the car.  When you hear the car start, you pop him." *Id*. at 70.  Smokey and the other

2   Hispanic man left, and the white man, standing about four feet from Garcia, began pointing the

3   rifle at his face.  Garcia was pleading in Spanish "please don't in the name of the Virgin Mary."

4   Pena heard the car start; the white man pointed the rifle at Garcia.  She covered her eyes and her

5   ears and heard a gunshot.  She hid under the covers for 5-10 minutes, she never heard the shooter

6   leave the room, but she finally peeked out and saw Garcia's body.  She went outside and told a

7   neighbor who called the police.

8          Pena gave a statement to the police.  When she was in a police car the officers brought

9   Smokey to her and asked her if he was one of the men.  She asked to hear him speak and then

10  identified him.  Within a day or so police showed her a photo lineup and she identified Holden as

11  the white man.  She testified that she "wasn't totally positive, but it was the most familiar one."

12  Pena identified Holden in the courtroom.  Over defense objection, the State elicited testimony

13  that Pena identified Smokey (Jerry Salas) in court during Salas' trial.  *Id*. at 80; *see also* Exh. 60,

14  p. 138.  On cross-examination, Pena stated that the arguing all took place in Spanish and that the

15  only English was when the white guy asked what time it was. *Id*. at 83-114.

16         Holden also testified at trial. Exh. 61, pp. 96-175.  He testified that he was in Las Vegas

17  in March 2004.  He needed money to return to his family in California.  On March 24, he met an

18  individual named Smokey; he wanted to sell a rifle to Smokey so that he could afford to travel

19  home.  Holden, Smokey, and apparently others were using methamphetamine that day.  He

20  accompanied Smokey to an apartment where another person owed Smokey money.  Holden

21  stated that he does not speak Spanish and that everyone in the apartment was speaking and

22  arguing in Spanish.  He did not know any of the other people present.  Smokey went into a

23  bedroom to look at a television.  Holden thought that the arguing had concluded.  He said that

another individual motioned for Holden to give him the rifle.  Holden handed him the rifle, the person raised the rifle and fired, killing the victim.  Holden testified that he was shocked.  He and Smokey returned to Smokey's apartment.  Holden said that he was told not to discuss the incident, or his family would be harmed.  Later Smokey took Holden's driver's license and told him that if he were to say anything about what happened that night the same thing might happen to his family.

Holden testified that while it was the third person who killed the victim, he told police on March 30 that he shot the victim in order to protect his family.  He also was under the influence of methamphetamine during the police interview.

On cross-examination, Holden testified that he had previously been convicted of first-degree murder.  He acknowledged that he accompanied Smokey to the apartment to collect the debt carrying his loaded AK47 rifle.  But he denied being an "enforcer" or that his role was to coerce the victim, maintaining that he was only there to sell the weapon. Exh. 61, pp. 113-175.

At a pretrial motions hearing, Steven Hall testified that he was Holden's cellmate for about two weeks just after Holden was arrested in March or April 2004. Exh. 71 (December 17, 2004 testimony of Steven Hall).  Hall stated that in March 2004 he signed a letter to the United States Attorney indicating that he was interested in making a proffer of information that may prove helpful to the government.  He testified that at that time the offer was open-ended; he believed that the information he would provide was related to his own federal case.  Hall testified that Holden bragged about two murders he had committed, and Holden started writing a journal on a legal pad.  He would write a page or so and then read it to Hall or let Hall read it.  Hall said he was writing it because "he wanted his family and people to know." *Id*. at 38.  When Holden

1  was moved to another facility, he left the journal with Hall and asked Hall to get it to Holden's

2  family.  Hall turned it over to his attorney.

3         At a pre-trial motions hearing, Holden testified that while in jail he was placed with

4  Steven Hall, an older inmate who took him under his wing and showed him the ropes. Exh. 11,

5  pp. 33-42.  Holden had never been in jail before.  Holden stated that Hall gave him a yellow

6  notepad and went through the discovery with Holden while directing him to write notes.  Holden

7  testified that Hall

8         told me to write about what happened, and he'd read it and if he didn't like it, he
       would tell me to change it, make it more gruesome, to make it more mean. . . .  He
9      thought – he said that if I looked crazy enough, that I would get off in a couple
       years by going to a mental facility instead of going to prison for the rest of my
10     life. . . . He said he was going to send [the journal] to a news crew . . . . I didn't
       know for a while what happened to [the journal], but eventually found out that he
11     just turned it over to his federal lawyer for a deal in another case.

12  *Id*. at 36. Holden stated that Hall "supervised" what Holden wrote in the journal, that he would

13  not have written the journal without Hall and that he left the journal in the cell for Hall's use

14  when Holden left.  The court ruled that the State would be permitted to introduce certain

15  passages of the journal, which the State did. *Id*. at 54-66; exh. 62, p. 30.

16         Amy Hatzenpiller testified at trial that she knew Holden as Jimmy Cross. Exh. 61, pp. 20-

17  29.  She also knew Smokey and the three of them would use drugs at Smokey's apartment.  They

18  were using drugs in Smokey's apartment on the night in question.  She testified that Smokey and

19  Jimmy said they had "to take care of something," and they left.  She stated that when they

20  returned Smokey said they "took care of what they had to take care of."  She testified that she

21  believed Jimmy was present when Smokey made that statement.

22         Rose Brim-Cornejo testified at trial that she knew someone by the name of Jimmy Cross

23  sometime around March 2004.  Exh. 60, pp. 213-240.  Brim-Cornejo was unable to identify

1   Holden a trial; she identified Jimmy Cross in a State's exhibit photograph of Holden. *Id*. at 214.

2   Jimmy and two other individuals went to her apartment to take drugs around March 2004.  At

3   some point Jimmy was in her room, and Brim-Cornejo left the room.  She never saw Jimmy with

4   a firearm.  A few hours later, the police came and asked if she had seen Jimmy.  She told them

5   that she had not.  The police came a second time and Brim-Cornejo gave consent for them to

6   search the apartment.  They found a gun in Brim-Cornejo's room.  She had never seen the

7   weapon before and had not given anyone permission to leave it in her room.  On cross-

8   examination she agreed that she did not actually witness the officers finding the gun in her room.

9   She told police that it must belong to Jimmy or the other two individuals because no one else had

10  been in her room.  Officers asked Brim-Cornejo if she knew where Jimmy was; she said she did.

11  She agreed to get Jimmy to go with her to a convenience store.  Officers met them at the

12  convenience store and took them both into custody.

13       Las Vegas Metro Detective Christopher Shawn Bunting testified. Exh. 60, pp. 245-265.

14  He identified Holden in court.  He stated that he searched Brim-Cornejo's apartment and found

15  the gun in her bedroom closet.  Brim-Cornejo told the detective that she thought she knew where

16  to find Holden, and he arranged for her to bring Holden with her to the nearby convenience store.

17  Bunting also identified a photo of Holden taken at the time he was taken into custody.

18       North Las Vegas Police Sergeant Harley Morgan testified. Exh. 61, pp. 28-46.  He

19  responded to the convenience store where Holden was taken into custody with Detective Dave

20  Molnar.  He stated that Molnar read Holden his *Miranda* rights and then asked Holden if he

21  would like to talk to the two officers.  Holden said he would talk to them.  They transported

22  Holden to the police station.  They again advised Holden of his *Miranda* rights and had him read

23  the form they give all arrestees, which sets forth the *Miranda* rights; Holden read and signed the

1  form.  They also asked again if he wanted to speak to them and he again indicated yes.  The

2  officers recorded the interview as well as the *Miranda* warnings with audio and video.

3       IV.    **Claims Rejected on Direct Appeal**

4       **Ground 1**

5       Holden contends that his Fourteenth Amendment right to due process was violated when

6  the prosecution characterized the deceased as a "victim." ECF No. 39, p. 13.  He argues that a

7  courtroom practice of allowing the prosecutor to refer to the deceased as a "victim" creates

8  inherent prejudice eroding the presumption of innocence and depriving a defendant of a fair trial

9  and due process.  In affirming Holden's convictions, the Supreme Court of Nevada reasoned:

> 10       Holden argues that to allow the prosecutor to so characterize the decedent
> "in a case where the defendant claims that he acted in self-defense creates an
> 11  inference of guilt and denies the defendant's due process right to a fair trial."  We
> note, however, that Holden never claims that he acted in self-defense.  Rather,
> 12  Holden's defense was that the decedent was shot by a third party.  We therefore
> conclude that even if the district court erred by allowing the prosecutor to refer to
> 13  the decedent as a "victim," Holden has not demonstrated that he suffered any
> prejudice.
>
> 14

15  Exh. 17, p. 1.  I agree.  Holden testified that he handed his rifle to a third person who shot

16  Garcia.  He cannot have suffered prejudice by any reference to "the victim" because the

17  question for the trier of fact was who shot the victim, not whether there was any victim.

18  Holden has not demonstrated that the Supreme Court of Nevada's decision was contrary

19  to, or involved an unreasonable application of, clearly established federal law as

20  determined by the Supreme Court of the United States, or was based on an unreasonable

21  determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d).

22  I deny federal habeas relief with respect to ground 1.

23  / / / /

**Ground 2**

Holden asserts that his Sixth Amendment right to present a defense was violated when the trial judge did not allow his expert witness to testify at trial. ECF No. 39, pp. 13-15.  Holden testified at trial that he falsely confessed to law enforcement in order to protect his family from the actual perpetrators. *See, e.g.*, exh. 61, 111-112.  The defense wanted psychologist Dr. Deborah Davis to testify regarding false confessions.

Dr. Davis testified at the pre-trial hearing on the State's motion in limine to preclude her from testifying as an expert. Exh. 61, pp. 54-81.  She stated that to prepare to testify in this case she talked with defense counsel, read a transcript of the interrogation, and looked at some of the videotape of the interrogation.  She never met with Holden.  She explained that typically she basically delivers a lecture to the jury on factors that can cause false confessions but said she usually does not testify to any ultimate conclusion in a specific case.  The state district court granted the motion to preclude her testimony, explaining:

> There's no science here that I see that is relevant to this case.  The offer of proof is that the testimony from Mr. Holden would be that he made a false confession to protect someone close to him.  That was the influence upon him.  Her testimony is, as I just stated, would basically be that that sometimes happens.  The fact that it has happened to other individuals, those are other individual cases I don't think are relevant to the jury's determination of whether it has happened here.  I don't think it's a scientific issue.  I don't think it's a proper subject for expert testimony. . . . To me, the issue that someone might make a false statement to protect a loved one is not an area of scientific inquiry.

*Id*. at 91-92.

The Supreme Court of Nevada rejected Holden's claim on appeal:

> Holden next contends that the district court improperly excluded the testimony of a proposed expert on false confessions.  The proposed expert would have testified that under some circumstances, individuals falsely confess.
>
>  NRS 50.275 allows for the admission of "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence

12

or to determine a fact in issue." The admissibility of expert testimony is within the sound discretion of the district court. *Smith v. State*, 100 Nev. 570, 572, 688 P.2d 326, 327 (1984).  In the instant case, the district court found that the proffered evidence was not helpful because whether Holden might have falsely confessed to protect his family was not an area of scientific inquiry.  We conclude that the district court did not abuse its discretion.

Exh. 17, p. 2.

Holden has failed to show that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  He is not entitled to federal habeas relief on ground 2.

**Ground 3**

Holden argues that his Sixth Amendment confrontation rights and Fourteenth Amendment due process rights were violated when the trial judge took judicial notice of a witness' prior in-court identification of a co-conspirator. ECF No. 39, pp. 15-16.  Federal courts may not interfere with a trial court's evidentiary rulings unless evidence wrongfully admitted was so prejudicial that its admission violated due process. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Pena testified at Holden's trial about her prior identifications of Smokey, including an in-court identification during Smokey's preliminary hearing. Exh. 60, pp. 77-80.  The State asked the trial judge to take judicial notice of the fact that Pena previously identified Smokey at a preliminary hearing. *Id*. at 137-140. The judge took it under advisement and later admitted the identification. *Id*. at 243-245.

The Supreme Court of Nevada rejected this claim:

Holden also contends that the district court erred by taking judicial notice of the fact that a witness had identified Holden's co-conspirator as being present when the murder occurred. The witness made the identification during the co-conspirator's preliminary hearing. Whether to take judicial notice of a fact is within the trial court's discretion. NRS 47.150; *see also* NRS 47.130.

In this case, the court's judicial notice was based on a certified transcript from the preliminary hearing, and so the fact that the witness had identified the co-conspirator was not subject to reasonable dispute. The record does not support Holden's argument that the taking of judicial notice of the earlier identification denied him the opportunity to challenge the witness on her memory and any potential bias. The witness herself testified that she had previously identified the co-conspirator, and defense counsel could have cross-examined her as to her memory and bias at that point. We therefore conclude that Holden's contention is without merit.

Exh. 17, pp. 2-3.

The record reflects that Pena testified at Holden's trial that she identified Smokey to the police officers after Garcia's murder and that she had identified Smokey during Smokey's criminal proceedings. Defense counsel had the opportunity to cross-examine her regarding the identification. Holden utterly fails to explain how Pena's identification of Smokey deprived him of due process. Holden testified that he and Smokey went to Garcia's apartment; the identity of Holden's co-conspirator was not at issue at trial.

Holden has failed to show that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground 3, therefore, is denied.

1    **Grounds 4 and 16**

2         In ground 4 Holden contends that his right to due process was violated when the trial

3    judge permitted the testimony of a coroner who worked at the Clark County Coroner's office at

4    the time of the autopsy but did not actually perform the autopsy. ECF No. 39, p. 16.  He argues

5    that the testimony lacked proper foundation.  In the remaining claim in ground 16, Holden

6    contends that his Sixth Amendment confrontation rights were violated when Dr. Alane Olson

7    was allowed to testify. *Id*. at 40-41.

8         The Sixth Amendment affords defendants the right to be confronted by witnesses against

9    them.  In *Crawford v. Washington*, the Supreme Court held that "[w]here testimonial evidence is

10   at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-

11   examination" in order for the evidence to be admitted. 541 U.S. 36, 68 (2004).

12        Medical examiner Dr. Alane Olson testified that she currently worked for the Clark

13   County Coroner's office and had been with the office at the time of the victim's autopsy. Exh.

14   60, pp. 31-55.  Dr. Olson stated that she did not perform the autopsy in this case but reviewed the

15   report.  She agreed with the report's conclusion that the victim died of a gunshot wound to the

16   head and that it was homicide.  She stated that the victim had alcohol, cocaine, cocaine

17   metabolite, methamphetamine, and methamphetamine metabolite in his system.

18        The Supreme Court of Nevada rejected this claim:

19             Specifically, Holden argues that there was improper foundation because
       Dr. Alane Olson, the medical examiner who testified, was not the medical
20     examiner who actually conducted the autopsy.  The district court allowed Dr.
       Olson to review the autopsy report and offer her expert testimony as to the
21     decedent's cause of death.  NRS 50.285 allows that the facts or data upon which
       an expert bases her opinion may either be perceived by her or made known to her
22     before the hearing.  We conclude that the district court did not err by allowing Dr.
       Olson's testimony.

23   Exh. 17, p. 3.

15

As with ground 1, there was no factual dispute at trial regarding whether the victim had died from a non-self-inflicted gunshot to the head; the question of fact was whether Holden was the shooter.  Ground 4 lacks merit.  Holden has not shown that the Supreme Court of Nevada's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Federal ground 4, therefore, is denied.

With respect to an alleged confrontation clause violation, Dr. Olson testified as to her opinion, albeit based on the previous medical examiner's report.  She was subject to cross-examination.  And, again, the victim's cause of death was not at issue.  Holden has not demonstrated a confrontation clause violation.  Thus, ground 16 is also denied.

V.    **Ineffective Assistance of Counsel Claims**

**Ground 5**

Holden argues that his trial counsel was ineffective in advising him to testify, which allowed his prior convictions to be admitted as impeachment, and in keeping with this strategy even after the State rested without introducing the contents of Holden's journal. ECF No. 39, pp. 17-20.

The state district court started an evidentiary hearing on Holden's state postconviction habeas corpus petition five years after the trial in March 2011, but the bulk of the hearing occurred in a second proceeding in April 2012. Exhs. 76, 77.  Bret Whipple, who represented Holden at trial and on direct appeal, testified. Exh. 77, pp. 4-71.  Whipple agreed that in this case, if Holden had not taken the stand that the jury would not have learned of his prior murder conviction.  He also agreed that if Holden had not testified none of the journal entries would

have been introduced.  Whipple stated that he and Holden discussed at length and over a period of time whether Holden should testify.  He stated that it was truly Holden's decision and that they both felt that the district attorney was "baiting" him into taking the stand.  He said that the strategic reason to have Holden testify was that he was the only defense witness; Holden had to take the stand and testify as to his version of events.  Whipple stated that, as he recalled, he felt that Holden did "a very good job" when he testified.

Whipple explained that their defense with respect to the journal was that Holden, who was in jail for the first time, was trying to impress an "old-timer" who had taken Holden under his wing; thus he wrote false or grossly exaggerated accounts of events in order to appear crazy or mentally impaired.  Whipple testified that he did not agree that the journal entries coming in negated any benefit to Holden testifying.  Whipple stated that he had had trials with defendants in very difficult positions that benefitted when their testimony was effective, even if there were issues on which they were impeached.

Whipple also recalled extensive pretrial litigation regarding the admission of the journal entries.  He also stated that he informed the court prior to opening arguments that Holden had little option but to testify in this case, and thus he was going to tell the jury about Holden's prior murder conviction.  The court then canvassed Holden about the strategic decisions by the defense; Holden acknowledged that he and his counsel agreed on the defense strategy.  He also agreed that the State had introduced Holden's videotaped confession during its case-in-chief; thus, the defense had to deal with damaging evidence even without the admission of the journal entries.

Holden briefly testified at the postconviction evidentiary hearing. Exh. 77, pp. 71-73.  He agreed that he and Whipple talked about whether he should testify and about the fact that that

would mean the jury would hear of his prior murder conviction.  Holden testified: "I was under

the impression that from what he was telling me it'd be the best thing to do . . . . I don't know

anything about the law.  So, he gave me the impression that it'd be best that I get on the stand.

So, I agreed with him." *Id*. at 73.

　　　　After the evidentiary hearing, the state district court denied Holden's postconviction

petition. Exh. 78.  The Supreme Court of Nevada affirmed the denial of the claim:

> First, appellant claims that trial counsel was ineffective for advising
> appellant to testify, which allowed his prior convictions and his journal to be
> admitted at trial.  Appellant fails to demonstrate that trial counsel was deficient or
> that he was prejudiced.  Appellant was informed at trial that it was his decision to
> testify.  At the evidentiary hearing, trial counsel testified that he and appellant had
> numerous discussions about whether appellant should testify, and that trial
> counsel did not push him either way.  Further, appellant's testimony was the only
> way to inform the jury that appellant was afraid for the lives of his wife and child,
> which could have attacked the integrity of his confession.  Moreover, appellant
> fails to demonstrate that there was a reasonable probability of a different outcome
> at trial had he not testified.  We note that there was overwhelming evidence of
> appellant's guilt without the introduction of his prior convictions and the journal.
> Therefore, the district court did not err in denying this claim.

Exh. 23, p. 2.

　　　　Holden has failed to demonstrate that the Supreme Court of Nevada's decision was

contrary to or involved an unreasonable application of *Strickland*.  Pena testified that Holden

shot the victim.  After his arrest, Holden told police that he shot the victim because the victim

owed Smokey money.  Holden then testified at trial to a substantially similar version of events as

Pena, with the key difference that he maintained that another individual asked Holden for his

rifle and then shot the victim.  Holden testified that he had falsely confessed out of fear for his

family's safety.  The jury evaluated the credibility of the witnesses.  Accordingly, Holden is not

entitled to federal habeas relief on ground 5.

/ / / /

**Ground 6**

Holden asserts that trial counsel was ineffective when he told the jury of Holden's prior convictions during opening arguments, in handling the prior conviction issue, and when he advised Holden to testify. ECF No. 39, pp. 20-21.  Rejecting this claim, the Supreme Court of Nevada explained:

> [A]ppellant claims that trial counsel was ineffective for mentioning his prior conviction for first-degree murder during his opening statement.  Appellant fails to demonstrate that trial counsel was deficient or that he was prejudiced.  Appellant was canvassed by the district court prior to counsel giving his opening statement as to whether appellant approved of his trial counsel's decision to inform the jury that he had previously been convicted of murder.  Appellant told the district court that he approved.  Further, appellant fails to demonstrate that there was a reasonable probability of a different outcome at trial had counsel not informed the jury of appellant's prior convictions given the overwhelming evidence of appellant's guilt.  Therefore, the district court did not err in denying this claim.

Exh. 23, p. 3.

Similar to ground 5, here Holden has failed to demonstrate that the Supreme Court of Nevada's decision was contrary to or involved an unreasonable application of *Strickland*.  Given the evidence of Holden's guilt, he has not shown a reasonable probability of a different outcome at trial if the jury had not learned of his prior conviction.  Thus, ground 6 is denied.

**Ground 7**

Holden argues in ground 7(A) that trial counsel was ineffective for failing to request a limiting instruction prior to introduction of the journal's other bad act evidence. ECF No. 39, p. 22.  The Supreme Court of Nevada affirmed the denial of this claim:

> Appellant fails to demonstrate that he was prejudiced.  While a limiting instruction was not given at the time the evidence was introduced, a limiting instruction was given to the jury at the close of evidence.  Further, appellant fails to demonstrate that there was a reasonable probability of a different outcome at trial had counsel requested a limiting instruction prior to the admission of the

other bad acts given the overwhelming evidence of appellant's guilt.  Therefore, the district court did not err in denying this claim.

Exh. 23, p. 3.

In ground 7(B) Holden asserts that appellate counsel was ineffective in failing to properly raise the issue that the district court erred by admitting the journal's other bad act evidence. ECF No. 39, p. 22-23.  The Supreme Court of Nevada ruled:

> Appellant failed to demonstrate that this claim had a reasonable probability of success on appeal.  The journal included admissions that appellant committed the crime and contradicted statements that appellant made while on the stand.  While it did inculpate appellant in the crimes, it was not unfairly prejudicial.  *See* NRS 48.035(1) (providing that relevant evidence is inadmissible if "its probative value is substantially outweighed by the danger of unfair prejudice" (emphasis added)); *State v. Eighth Judicial Dist. Court*, 127 Nev. __, ___, 267 P.3d 777, 781 (2011) (explaining that "unfair" prejudice refers to a decision based on an improper basis, such as emotion or bias).  Further, some of the more inflammatory passages were not admitted at trial. Therefore, the district court did not err in denying this claim.

Exh. 23, pp. 9-10.

Holden has not shown that the Supreme Court of Nevada's decisions were contrary to or involved an unreasonable application of *Strickland*.  The trial court gave a limiting instruction with respect to the journal. Exh. 57.  Holden testified that he was not the shooter; the journal contradicted his testimony.  He has not demonstrated a reasonably probability of success on appeal.  Ground 7 is, therefore, denied.

**Ground 8**

Holden contends that his trial counsel was ineffective in conceding Holden's possible guilt during jury selection and again during closing argument. ECF No. 39, pp. 23-24.  During voir dire, defense counsel explained to the prospective jurors that the burden lies with the State to prove every element of the crime beyond a reasonable doubt:

> I have to tell you I've been doing this a couple of years, and the one thing that inherently surprises me every time is the fact that so many folks believe that my client, the defendant, whatever the case may be, has a burden to prove himself innocent. . . .
>
> And I want to clarify that – and I know a lot of you already recognize it, but you know, at the same time not many of you have been in this type of situation – and that is that I have nothing to do. I mean I have no burden. It's a remarkable system. The State of Nevada represented by these two fine attorneys have all the obligations and all the burdens in this case.
>
> You know, it's not unusual for us to go through an entire case, you know, sit over here, maybe not even ask a question, not call a witness, sit there and smile, and at the end of the case come up to you and say, hey, you know what? They may have a smoking gun, you may think that maybe he's guilty, but they haven't proved it beyond a reasonable doubt. These guys, these folks, the State of Nevada, have to prove each and every element beyond a reasonable doubt. We have to do nothing. . . .
>
> But the bottom line is, you know, they have to prove the facts, each and every element. We don't have to do anything.
>
> And if I – if my conclusion at trial is I came up to you and say, hey, you know what? Maybe my client is guilty. Maybe he is. But they haven't proved it beyond a reasonable doubt. I have to feel comfortable with the jury because that's the law; and I want to make sure that you feel comfortable with yourself as a juror as well.

Exh. 59, pp. 100-101. Defense counsel also stated during closing: "Now, I'm not – please don't get me wrong. I'm not saying that – that he's a good guy or that what he did was anything positive about this situation at all. I'm not wanting to suggest anything to the such. I just want you to know what the law is." Exh. 62, p. 60.

The Supreme Court of Nevada held that the record demonstrated that trial counsel did not concede Holden's guilt during voir dire or closing arguments. Exh. 23, pp. 3-4. I agree. This claim is belied by the record. Holden's counsel merely explained to the jurors the burden on the State to prove a defendant's guilt beyond a reasonable doubt. Holden has failed to demonstrate

that the Supreme Court of Nevada's decision on federal ground 8 was contrary to or involved an

unreasonable application of *Strickland*.  Habeas relief is denied as to ground 8.

**Ground 9**

Holden claims in ground 9(A) that trial counsel was ineffective in failing to request

instructions consistent with his theory of defense. ECF No. 39, pp. 24-27.

The Nevada Supreme Court explained:

> [A]ppellant claims that trial counsel should have requested an instruction on "use"
> liability for the deadly weapon enhancement where it is a co-conspirator who used
> the weapon and not the defendant.  Appellant fails to demonstrate that he was
> prejudiced.  Appellant fails to demonstrate a reasonable probability of a different
> outcome at trial had trial counsel requested an instruction on "use" liability
> because of the overwhelming evidence at trial that appellant was the one who shot
> the victim.  Therefore, the district court did not err in denying this claim.

Exh. 23, pp. 4-5.

In ground 9(B) Holden argues that trial counsel failed to object during the State's closing

argument when the State mischaracterized the law, confused the meaning of the jury instructions,

and lessened the burden of proof required to convict. ECF No. 39, pp. 24-27.  The Supreme

Court of Nevada rejected these claims:

> Seventh, appellant claims that trial counsel was ineffective for failing to
> object to the State's argument in closing regarding second-degree felony murder.
> Further, he claimed that trial counsel should have objected to the State's argument
> that "if Smokey did it and there's evidence that [appellant] conspired with
> Smokey, he's guilty."  First, although it appears that the State made an argument
> regarding second-degree felony murder, appellant fails to demonstrate a
> reasonable probability of a different outcome at trial had counsel objected because
> the jury found appellant guilty of first-degree murder.  Second, the statement
> relating to Smokey was a correct statement of the law regarding conspiracy
> because appellant is liable for the murder if appellant conspired with Smokey to
> commit the murder even if Smokey carried out the murder. *Bolden*, 121 Nev. at
> 922, 124 P.3d at 200-01.  Therefore, the district court did not err in denying this
> claim.
>     ….

Ninth, appellant claims that trial counsel was ineffective for failing to object to the State's improper argument during closing.  Specifically, appellant claims that the State improperly invoked God when it used the phrase "God only knows."  Further, appellant claims that the State told the jury that being blindfolded "is the only way you would be able to follow the story that the defendant told you," which mocked his defense.  Appellant failed to demonstrate that trial counsel was deficient or that he was prejudiced.  As to the "God only knows" comments, appellant fails to demonstrate that this was improper and trial counsel should have objected because it was used as a turn of phrase and was not invoking God. *See Epps v. State*, 901 F.2d 1481, 1483 (8th Cir. 1990) (explaining that prosecutor's comments that were not objectionable could not be a basis for an ineffective-assistance claim based on counsel's failure to object).  Further, appellant fails to demonstrate that there was a reasonable probability of a different outcome at trial had trial counsel objected to either of the statements.  Therefore, the district court did not err in denying this claim.

Exh. 23, pp. 5-6.  The prosecutor made the "blindfolded" statement in closing and also urged that "God knows you couldn't believe [Holden] on the stand because of the basis of all the lies he apparently told the police or was it all the lies he told on the stand so you can't believe what he told the police?" Exh. 62, pp. 47, 75-76.

In light of the overwhelming evidence of Holden's guilt, he cannot demonstrate the reasonable probability of a different outcome had a "use" instruction been given.  Further, Holden has not shown that the complained-of statements in closing were improper or inaccurate.  He has not demonstrated that the Supreme Court of Nevada's decisions on federal grounds 9(B) and 9(C) were contrary to or involved an unreasonable application of *Strickland*.

Holden contends in ground 9(C) that appellate counsel failed to raise the issue of the State's improper argument on appeal. ECF No. 39, pp. 27-28.  The Supreme Court of Nevada held that Holden failed to demonstrate that this claim had a reasonable probability of success on appeal and noted that it had previously concluded that the State's arguments were not improper. Exh. 23, p. 10.  Holden has not shown that that decision was contrary to or involved an

1 unreasonable application of *Strickland*.  Accordingly, federal habeas relief is denied as to all

2 claims in ground 9.

3 **Ground 10**

4     Holden argues in ground 10(A) that trial counsel was ineffective for failing to object to

5 prosecutorial misconduct during closing arguments.  ECF No. 39, pp. 28-30.  The prosecutor said

6 during closing: "Right now as you sit here Jim Holden is no longer presumed innocent."  Exh. 62,

7 p. 45.  Defense counsel objected, and the trial judge directed the prosecutor to rephrase.  The

8 prosecutor then said: "The facts are already in.  That's when you can determine what happens.

9 You go back there and deliberate.  But you've got all of the evidence now.  The contrary has

10 been proven." *Id*. at 46.  The Supreme Court of Nevada affirmed the denial of this claim:

11     [A]ppellant claims that trial counsel was ineffective for failing to object to the
State's argument during closing that appellant was no longer entitled to the
12     presumption of innocence.  Appellant fails to demonstrate that trial counsel was
deficient or that he was prejudiced.  This claim is belied by the record.  Trial
13     counsel did object and the district court asked that the State rephrase.  Further,
appellant fails to demonstrate a reasonable probability of a different outcome at
14     trial had trial counsel made further argument regarding the objection given the
overwhelming evidence of appellant's guilt.  Therefore, the district court did not
15     err in denying this claim.

16 Exh. 23, p. 6.

17     As ground 10(B), Holden contends that appellate counsel was ineffective for failing to

18 raise this issue of prosecutorial misconduct on appeal.  ECF No. 39, pp. 28-30.  The Supreme

19 Court of Nevada reasoned that Holden failed to demonstrate a reasonable probability of success

20 of this claim on appeal, noting that it had already determined that the State's arguments during

21 closing were not improper, and therefore, there was no reversible error. Exh. 23, p. 10.

22

23

1    Again, in light of the strong evidence of Holden's guilt, he has not demonstrated that the

2  Supreme Court of Nevada's decisions on federal grounds 10(A) and (B) were contrary to or

3  involved an unreasonable application of *Strickland*.  Thus, ground 10 is denied in its entirety.

4    **Ground 11**

5    Holden contends in ground 11(A) that trial counsel was ineffective in failing to prepare

6  for trial by investigating and fully raising the issue of whether Holden's statement to police

7  should be suppressed as a *Miranda* violation. ECF No. 39, pp. 30-32.

8    The trial judge held a hearing on Holden's pretrial motion in limine to suppress his

9  interview with police. Exh. 59, pp. 139-145.  Holden testified that when he was arrested at the

10  convenience store the initial officer with whom he had contact was being "quite rude . . .  and

11  obnoxious pretty much that I didn't want to talk to him anymore and that I wanted to see a

12  lawyer.  Immediately after that [the first officer] had two detectives come over to me, and they

13  started asking me questions and asked me if I wanted to talk to them. . . . They were being nice

14  to me, so I didn't feel that I was being threatened or disrespected, so I told them, sure I'll talk."

15  *Id*. at 139-140.   On cross-examination he stated that the detectives read him his *Miranda*

16  warnings at the police station.  He also said: "when they arrested me, I told them I wanted to talk

17  to a lawyer, and I didn't want to talk to them.  And then when the detectives came, I told them

18  that I would talk to them because, you know, they were being okay with me." *Id*. at 145.  He

19  agreed with the district attorney that in his statement to police he never once mentioned anything

20  about wanting an attorney.

21    The trial judge denied the motion to suppress the statement. *Id*. at 148.  Affirming the

22  denial of this claim, the Nevada Supreme Court reasoned:

23    [A]ppellant claims that trial counsel was ineffective for failing to investigate and
    fully raise a *Miranda* issue. *Miranda v. Arizona*, 384 U.S. 436 (1966).

Specifically, appellant claims that when he was first approached by Las Vegas Metropolitan Police Department officers he refused to speak to them and requested an attorney. Appellant fails to demonstrate that trial counsel was deficient or that he was prejudiced. Trial counsel did argue a motion to suppress the confession based on a *Miranda* violation and appellant fails to demonstrate that further investigation or argument would have changed the outcome of the hearing on the motion. Appellant's invocation after the Las Vegas Metro Police Department officers spoke to him was scrupulously honored; later he was again fully informed of his *Miranda* rights, and he told the police he was willing to talk to them. *See Dewey v. State*, 123 Nev. 483, 490-91, 169 P.3d 1149, 1153-54 (2007). Further, the district court determined that appellant was not credible when he claimed that he told the police officers that he wanted an attorney. Therefore, the district court did not err in denying this claim.

Exh. 23, pp. 6-7.

Holden argues in ground 11(B) that appellate counsel was ineffective in failing to raise the issue on appeal. ECF No. 39, pp. 30-33. The Supreme Court of Nevada disagreed again:

[A]ppellant claims that appellate counsel was ineffective for failing to argue that appellant's confession should have been suppressed because of a *Miranda* violation. Appellant fails to demonstrate that this claim had a reasonable probability of success on appeal. As discussed previously, there was no *Miranda* violation and the district court concluded that appellant was not credible. Therefore, the district court did not err in denying this claim.

Exh. 23, p.11. No credible evidence was presented that a violation of Holden's *Miranda* rights occurred. He has not shown that the Supreme Court of Nevada's decision was contrary to or involved an unreasonable application of *Strickland*. I deny grounds 11(A) and 11(B).

**Ground 12**

Holden asserts that his counsel was ineffective in failing to present expert and lay testimony to challenge the reliability of Holden's statements made during the police interrogation. ECF No. 39, pp. 33-36. As discussed above, after a hearing at which the expert testified, the trial judge ruled that the fact that some people falsely confess is not an area of scientific inquiry and refused to let the expert testify at trial. Exh. 61, p. 93. Defense counsel

testified at the evidentiary hearing on Holden's first state postconviction petition that he wanted

the expert to testify only generally about the fact that false confessions occur, and he did not

have the expert review the entire videotape of the confession or interview Holden because he

was concerned she would conclude that Holden did not falsely confess.  Exh. 77.

The Supreme Court of Nevada rejected this claim as well.

> Appellant fails to demonstrate that trial counsel was deficient or that he was
> prejudiced.  Trial counsel attempted to present an expert on false confessions, but
> the district court did not allow it because the testimony that appellant may have
> falsely confessed to protect his family was not an area of scientific inquiry.  This
> court affirmed that decision on appeal. *Holden v. State*, Docket No. 47698 (Order
> of Affirmance, October 17, 2007).  Appellant argues that had trial counsel
> actually had the expert speak with appellant and view the videotape of his
> confession, the expert would have been allowed to testify.  Trial counsel testified
> at the evidentiary hearing that he did not have the expert review the confession
> videotape or interview appellant because he was afraid her conclusion would be
> that appellant did not falsely confess and he wanted her to only testify in general
> about false confessions.  This was a reasonable trial strategy and the district court
> did not err in denying this claim.

Exh. 23, pp. 7-8.  Holden has not shown that this decision was contrary to or involved an

unreasonable application of *Strickland*.  After a hearing, the trial judge refused to allow

the proffered expert to testify.  Further, Holden provides nothing to counter his counsel's

explanation that he intended to have the expert testify generally about false confessions

because he did not want to risk that the expert would conclude that in this particular case

she did not believe that Holden had testified falsely.  Ground 12, therefore, is denied.

**Ground 13**

Holden asserts that his appellate counsel was ineffective in failing to raise the issue of

inadmissible hearsay admitted against him in violation of *Bruton v. United States*, 391 U.S. 123

(1968) and the Sixth Amendment. ECF No. 39, pp. 37-38.  In *Bruton*, the Supreme Court held

1   that the admission at trial of a non-testifying codefendant's statement inculpating the defendant

2   violates the defendant's Sixth Amendment right to confrontation. *Bruton*, 391 U.S. 123 (1968).

3           The Supreme Court of Nevada affirmed the denial of this claim on appeal:

4           [Holden] claims that appellate counsel was ineffective for failing to argue that
            Amy Hatzenpiller's testimony that Smokey stated "they took care of what they
5           had to take care of," was inadmissible hearsay. Appellant fails to demonstrate
            that this claim had a reasonable probability of success on appeal. The statement
6           was admitted, over the objection of trial counsel, on the grounds that it was an
            adoptive admission. Because appellant was in the room when the statement was
7           made and it was a statement that it would be expected that appellant would dissent
            from, the statement was properly admitted at trial as an adoptive admission.
8           *Maginnis v. State*, 93 Nev. 173, 175, 561 P.2d 922, 923 (1977); NRS
            51.035(3)(b). Therefore, the district court did not err in denying this claim.
9

10  Exh. 23, pp. 10-11. Holden has failed to demonstrate that this decision was contrary to or

11  involved an unreasonable application of *Strickland*. His counsel objected to the admission of

12  Hatzenpiller's statements about what others said that night. Defense counsel had the opportunity

13  to cross-examine the witness but asked no questions. *See* Exh. 61, p. 28. Holden has not shown a

14  reasonable probability of a different outcome on appeal if his appellate counsel had raised this

15  issue. I deny relief as to ground 13.

16          **Ground 17**

17          In the remaining claim in ground 17, Holden argues that trial counsel was ineffective for

18  failing to challenge prosecutors' use of inmate-informant Steven Hall. ECF No. 39, pp. 41-45.

19  The respondents point out that Holden did not present this claim to the highest state court. *See*

20  Exhs. 22, 23. Holden responds that if the claim is unexhausted, it would be procedurally barred

21  as untimely and successive if he attempted to return to state court to exhaust the claim. ECF No.

22  48, pp. 10-18. He urges me to treat the claim as technically exhausted or procedurally defaulted.

23

"Procedural default" refers to the situation where a petitioner in fact presented a claim to the state courts but the state courts disposed of the claim on procedural grounds, instead of on the merits.  A federal court will not review a claim for habeas corpus relief if the decision of the state court regarding that claim rested on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991).  The *Coleman* Court explained the effect of a procedural default:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

Holden describes a claim as "technically exhausted" if  the state courts would no longer review it on the merits.  He acknowledges that that would be the case if he tried to submit a new petition with this claim to the state courts.  First, the state courts would find his petition time-barred because he would be filing it outside the one-year limitation period. *See* NRS 34.726. Second, the state courts would find the petition successive. *See* NRS 34.810.  Indeed, the state courts have already held that Holden's second and third state postconviction petitions were procedurally barred. *See* Nevada Supreme Court Case Nos. 65331, 67970.  Holden agrees that the state courts would almost certainly apply those procedural bars and argues that therefore he does not have an available remedy in state court.  However, he asserts that he can demonstrate cause and prejudice to excuse the procedural default.

To demonstrate cause for a procedural default, the petitioner must be able to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural

rule. *Murray*, 477 U.S. at 488 (emphasis added).  For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

In federal habeas cases arising out of Nevada, the state courts generally apply substantially the same standards as the federal courts in determining whether a petitioner can demonstrate either cause or actual innocence in order to overcome a claimed procedural default.  Thus, if the petitioner has a potentially viable cause-and-prejudice or actual-innocence argument under the substantially similar federal and state standards, then the petitioner cannot establish that "it is clear that the state court would hold the claim procedurally barred." *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002)(emphasis added; prior case citations and quotation marks omitted). On the other hand, if the petitioner has no such potentially viable arguments, then the claim is technically exhausted but it also is subject to immediate dismissal with prejudice as procedurally defaulted.

Ineffective assistance of counsel claims present a different situation in this context. Holden argues that he can show cause and prejudice to excuse the default of federal ground 17 based on *Martinez v. Ryan*, 566 U.S. 1 (2012), because he received ineffective assistance of state postconviction counsel. ECF No. 48, pp. 5-10.  The Court in *Coleman* held that ineffective assistance of counsel in postconviction proceedings does not establish cause for the procedural default of a claim. *Coleman*, 501 U.S. at 750.  In *Martinez*, the Court established a "narrow exception" to that rule:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17.  The Ninth Circuit has provided guidelines for applying *Martinez*:

> To demonstrate cause and prejudice sufficient to excuse the procedural default, therefore, *Martinez* . . . require[s] that Clabourne make two showings.  First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland [v. Washington*, 466 U.S. 668 (1984)].  *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different.  Second, to establish "prejudice," he must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) (citations omitted).

The Supreme Court emphasized in *Martinez*, however, that its holding applies only in the context of the initial-review collateral proceedings:

> When an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim. . . . The same is not true when counsel errs in other kinds of postconviction proceedings.  While counsel's errors in [initial-review] proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding.

566 U.S. 1 at 10-11.

In Holden's case, he presented this claim to the state district court in his first state postconviction pro se petition and counseled supplemental petition. Exhs. 18, 19.  The respondents briefed the issue in their opposition. Exh. 71.  The state district court thus had an opportunity to consider the claim, though it narrowed the focus of the evidentiary hearing more to the admission of the journal entries themselves. *See* Exh. 77.  Holden's trial counsel also testified at the evidentiary hearing that part of their defense was that Steven Hall manipulated Holden and told him he should write outrageous, gruesome things in his journal in order to appear crazy—with the intention of Hall turning the journal over to the U.S. Attorney in exchange for favorable treatment in his federal criminal case. *See, e.g.*, *id.* at 35.  In any event,

the claim was presented to the state district court.  Holden's postconviction counsel did not

present the claim on appeal of the denial of his first state postconviction petition.  The claim,

therefore, is unexhausted or technically exhausted or anticipatorily defaulted.  But *Martinez*

cannot provide cause and prejudice to excuse the default because the claim was presented during

the initial collateral review proceedings.  Therefore, ground 17 is dismissed as procedurally

barred.  I note that Holden would not have been able to demonstrate a reasonable probability of a

different outcome to his state postconviction proceedings had counsel exhausted this claim, in

light of the eyewitness testimony and Holden's own confession.

**Ground 14**

Finally, Holden contends in ground 14(A) that the cumulative effect of trial counsel's

failures, and in ground 14(B) that the cumulative effect of appellate counsel's failures, violated

his rights to effective assistance of counsel. ECF No. 39, pp. 38-39.  The Supreme Court of

Nevada rejected these cumulative error claims, holding that Holden did not demonstrate that any

alleged errors by counsel, singly or cumulatively, would have had a reasonable probability of

altering the outcome at trial or on appeal. Exh. 23, p. 11.  The court concluded that the evidence

of Holden's guilt was overwhelming and that he had not shown a reasonable probability of a

different outcome either at trial or on appeal.

"The Supreme Court [of the United States] has clearly established that the combined

effect of multiple trial errors violates due process where it renders the resulting criminal trial

fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).  I agree with the

Supreme Court of Nevada that Holden has not shown the reasonable probability of a different

outcome at trial or on appeal.  Thus, Holden has failed to demonstrate that the Supreme Court of

1  Nevada's decision was contrary to or involved an unreasonable application of *Strickland*.

2  Accordingly, ground 14 is denied.

3       I therefore deny the petition in its entirety.

4      **VI.**   **Certificate of Appealability**

5       This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing

6  Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  I have *sua*

7  *sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28

8  U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

9       A COA may issue only when the petitioner "has made a substantial showing of the denial

10  of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits,

11  a petitioner "must demonstrate that reasonable jurists would find the district court's assessment

12  of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)

13  (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

14  issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

15  denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

16       None of my rulings on Holden's petition meets the *Slack* standard.  I therefore decline to

17  issue Holden a certificate of appealability.

18      **VII.**   **Conclusion**

19       I THEREFORE ORDER that the petition (ECF No. 39) is denied.

20       I FURTHER ORDER that a certificate of appealability is denied.

21       I FURTHER ORDER the Clerk of Court to enter judgment and close this case.

22       Dated: June 26, 2020.

23                             _____

                                         U.S. District Judge Andrew P. Gordon